Sofie Eger v. Commissioner.
Eger v. Commissioner
Docket No. 2866-64.
United States Tax Court
T.C. Memo 1966-192; 1966 Tax Ct. Memo LEXIS 93; 25 T.C.M. (CCH) 986; T.C.M. (RIA) 66192; August 30, 1966
Benjamin Tannenbaum, 350 Fifth Ave., New York, N. Y., for the petitioner. John B. Murray, Jr., for the respondent. TANNENWALD
Memorandum Findings *94 of Fact and Opinion TANNENWALD, Judge: Respondent has determined deficiencies in the income tax of petitioner and Fred Eger for the years and in the amounts as follows: Year
Amount
1958
$2,428.88
1959
2,540.15
1960
1,738.36
After agreement concerning two of the issues raised by respondent's deficiency notice, there remains for our determination only the issue of whether the petitioner is entitled to a loss carryback to the years in question, as a result of a claimed ordinary loss in 1961, under the provisions of section 1244(a) of the Internal Revenue Code of 1954, due to the alleged worthlessness of certain stock. Respondent concedes that, if petitioner suffered such a loss in 1961, she is entitled to carry it back to 1958, 1959, and 1960. Findings of Fact Some of the facts are stipulated and are found accordingly. Sofie Eger (petitioner [1]) and Fred Eger were husband and wife prior to Fred's death on January 20, 1964. They filed joint Federal income tax returns for the taxable years 1958 to 1961, inclusive, with the district director of internal revenue at Brooklyn, New York. *95 Petitioner and Fred incorporated Windmill Food Stores of Hewlett, Inc. (hereafter referred to as Hewlett) on March 10, 1959, under the laws of the State of New York, with an authorized capital of 200 shares, all without par value. Hewlett operated a supermarket. The minutes of the first meeting of the Board of Directors of Hewlett, held on March 31, 1959, were on a standard form with blank spaces designed to be filled with the missing details. They contained the following: The Secretary then presented to the meeting a written proposal from Fred Eger and Sofie Eger to this Corporation. Upon motion duly made, seconded and carried, the said proposal was ordered filed with the Secretary, and he was requested to spread the same at length upon the minutes, said proposal being as follows: That Fred and Sofie Eger will purchase stock of the Windmill Food Stores of Hewlett, Inc. and that they will do so provided that the said common stock is issued pursuant to the terms and provisions of Section 1244 of the Internal Revenue Code. Upon motion duly made and seconded and carried it was RESOLVED that the corporation accepts the offer and the conditions of the *96 offer of Fred and Sofie Eger to purchase common stock of the corporation and that it be issued pursuant to Section 1244 of the Internal Revenue Code. [Emphasis added.] The italicized portion was from the form and the non-italicized portion was typed in. Property having a cost basis to petitioner and Fred of $93,837.96 was transferred to Hewlett in exchange for notes in the principal amount of $53,837.96 and 40 shares of Hewlett stock, which were issued 20 shares each to petitioner and Fred. Prior to the issuance of these shares, petitioner and Fred had caused to be redeemed for $40,000 shares of another corporation held by them and had transferred the proceeds of that redemption to Hewlett for the shares. The cost of the 40 shares to petitioner and Fred was $40,000. At all times material hereto, these 40 shares represented all of the issued and outstanding stock of Hewlett. Subsequently, petitioner loaned $8,200 to Hewlett. On January 17, 1961, Hewlett filed a petition for a Chapter XI arrangement under the Federal Bankruptcy Act showing total assets of $168,170 and total liabilities of $131,500 and that Hewlett expected to make a profit at least during *97 the thirty-day period following the filing of the petition. Petitioner and Fred were listed as unsecured creditors to the extent of $62,037.96 for loans to Hewlett. Petitioner and Fred jointly claimed $53,837.96 of such loans and petitioner individually claimed $8,200. In an affidavit filed April 14, 1961, in the Chapter XI proceeding, Fred stated that no monies were due him as a creditor of Hewlett. Subsequently, a proposed plan of arrangement, dated March 3, 1961, was filed whereby Hewlett would pay its unsecured creditors 22 1/2 percent of their claims. Upon the schedule accompanying the proposed plan, petitioner was listed as an unsecured, non-priority creditor in the amount of $62,037.96, with the proposed 22 1/2 percent payment of $13,958.54. Between these two figures was handwritten "(waived)." On March 10, 1961, while the proposal for a plan of arrangement was still pending, petitioner and Fred entered into an agreement with Pick 'N Save, Inc. whereby the former agreed to sell and the latter agreed to purchase the 40 shares of Hewlett stock. The purchase price was $100,000 plus the value of certain security deposits and other items and plus the value of inventory of Hewlett *98 on the date of closing, less credits for certain secured liabilities and other items. The agreement further specified that all the payments on account of the purchase price were to be deposited with and held by one Benjamin Tannenbaum, Esq., in escrow for one year after the closing for the purpose of paying any claims presented by creditors of Hewlett for moneys "due and owing by the corporation up to and including the date of the closing." After this period the remaining funds could be paid over to petitioner and Fred. Fifty thousand dollars of the purchase price was paid on the signing of the agreement and the balance was to be paid in cash and notes at the closing. The sale was made contingent upon a plan being confirmed by the referee in the Chapter XI proceeding. At the closing petitioner and Fred were to deliver executed general releases of all obligations owed to them by Hewlett. The plan was confirmed on April 13, 1961, and Tannenbaum deposited $40,100 in the Peninsula National Bank, Cedarhurst, New York, for the purpose of paying creditors. On April 14, 1961, the stockholders and directors of Hewlett met at a duly called special joint meeting and by unanimous vote passed *99 the following resolution: RESOLVED, that WINDMILL FOOD STORES OF HEWLETT, INC. reaffirms its obligation on the indebtedness due from the corporation to SOFIE EGER and that said indebtedness is to be reflected on the books of the corporation. The minutes also recited that Sofie Eger would accept as full payment on the reaffirmed indebtedness any sums left with the escrowee (Tannenbaum) after all other creditors of the debtor in possession of the corporation had been paid. Thereafter, on April 14, 1961, Sofie Eger and Fred Eger executed and delivered to Hewlett a general release of all claims they had against the corporation and signed an affidavit that the stock which they owned in Hewlett was not in any way encumbered. The sale to Pick 'N Save, Inc. was closed on April 14, 1961. As the balance of the purchase price, Pick 'N Save, Inc., paid $49,141.57 in cash and delivered six notes of $2,500 each (or a total of $15,000), each note to be paid monthly commencing with one month from the date of closing. The gross purchase price, including debits, was $132,402.99, and the total credits, including the down payment of $50,000 and the $15,000 in notes, amounted to $83,261.42. All *100 but $30,000 of the net proceeds of the sale was used to pay creditors (other than petitioner) to whom Hewlett was indebted, including creditors in accordance with the plan of arrangement and those who became creditors after the filing of the petition. The remaining $30,000 was paid to petitioner. On their 1961 joint Federal income tax return, the petitioner and Fred treated the sale of their stock to Pick 'N Save, Inc. as an ordinary loss under section 1244 of the Internal Revenue Code of 1954, claiming that the $30,000 was paid to petitioner on account of an indebtedness from Hewlett, that no payments were received on account of the stock, and that the stock having a cost basis of $40,000 became worthless in that year. An application for tentative carryback adjustment (Form 1045) was filed with the district director by the petitioner and Fred, wherein they claimed as a net operating loss for the year 1961 the amount of $35,440.33 (taking into account the alleged $40,000 loss on Hewlett stock) to be carried back to the years 1958, 1959, and 1960. The application for a tentative carryback adjustment was originally allowed by the district director and *101 refunds of income taxes paid to the petitioner and Fred for the taxable years 1958, 1959, and 1960. Thereafter, the allowance of the carryback was reversed, the application disallowed, and a statutory notice of deficiency issued for the years and in the amounts of the refunds. Opinion Petitioner claims that the $30,000 which she received from Pick 'N Save, Inc. was solely attributable to the alleged indebtedness from Hewlett to her and that therefore the 40 shares of stock issued to Fred and her became worthless in 1961. She further claims that the shares were issued pursuant to section 1244 and that consequently she and Fred were entitled to an ordinary loss under section 1244(a)[2] to the extent of the $40,000 cost basis of the shares. Respondent denies the loss on various alternative grounds, including the assertion that the shares were not section 1244 stock. *102 Section 1244 was enacted in 1958 to aid and encourage small businesses by increasing the volume of external financing of small businesses. The encouragement of such financing was provided by according ordinary loss treatment to qualifying investments in small businesses that prove to be financially unsuccessful. See H. Rept. No. 2198, 85th Cong., 1st Sess., p. 2 (1958), 1959-2 C.B. 709, 711. In order to qualify as section 1244 stock, certain requirements must be met. The critical question herein is whether Hewlett "adopted a plan * * * to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan" as required by section 1244(c)(1)(A). [Emphasis added.] Petitioner does not dispute the validity of respondent's regulation (Sec. 1.1244(c)-1(c), Income Tax Regs.) which requires that the plan be in writing. Indeed, he would be hard put to do so. The intention of Congress that there be a written plan is confirmed by the legislative history.[3] Moreover, such a requirement is consistent with the statutory mandate that the period of the offering be "specified in the plan." Section *103 1244(c)(1)(A). Finally, the regulation was issued pursuant to the broad authority delegated to respondent by section 1244(e)[4]. See Jules Samann, 36 T.C. 1011, 1016 (1961), affd. 313 F. 2d 461 (C.A. 4, 1963).
Petitioner asserts, however, that the minutes of the first meeting of the board of directors of Hewlett meet this requirement. We disagree. The minutes do state that a "written proposal" was presented and that it was ordered spread upon the minutes. But this portion of the minutes reflects merely the standard form. We think it more than likely that no such written proposal ever existed. [5] The typed-in portion of the minutes merely states that the "common stock * * * be issued pursuant to Section 1244 of the Internal Revenue Code." There *104 is no stated period during which the stock would be offered. [6] The blanket statement in the minutes was not sufficient to bring the offering under section 1244(c). [7]
*105 The linchpin of petitioner's case is missing. Granted that Congress may have intended to afford liberal treatment to losses of the type involved in section 1244, we are unable to find that petitioner has met the minimum statutory requirement. In view of this conclusion, we need not consider the tax effects of the waiver of indebtedness by petitioner and Fred [8] in the Chapter XI proceeding coupled with the later attempt to revive the indebtedness to petitioner, the subsequent release of that indebtedness, and the allocation of the $30,000 payment to the indebtedness rather than the shares. [9]
*106 Decision will be entered under Rule 50. Footnotes
1. The petition herein was originally filed on June 24, 1964 in the name of Sofie Eger and Fred Eger. It appeared, however, that Fred Eger had died prior thereto and that the petition was neither executed, verified, nor filed on behalf of his estate. Accordingly, on September 23, 1964, the petition was dismissed for lack of jurisdiction insofar as it related to Fred Eger.↩
2. All references are to the Internal Revenue Code of 1954. SEC. 1244. LOSSES ON SMALL BUSINESS STOCK. (a) General Rule. - In the case of an individual, a loss on section 1244↩ stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.
3. In the section-by-section analysis of the proposed section 1244, the House Committee Report states that "[such] plan must be in writing." H. Rept. No. 2198, 85th Cong., 1st Sess., p. 8 (1958), 1959-2 C.B. 709↩, 714. 4. Section 1244(e)↩ states: "The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section."
5. Petitioner claims that a written proposal existed containing the information required by section 1244(c)↩ but that after the arrangement and the sale to Pick 'N Save, Inc. all records of Hewlett passed out of the possession of the Egers and it therefore could not be located. We find it hard to believe that the records were sufficiently available to produce a photostatic copy of the signed minutes but not of the written proposal allegedly incorporated therein. It is also worthy of note that none of the witnesses directly testified that there was a written proposal. 6. The assertion in petitioner's reply brief that the date of April 6, 1959 was specified is without any support in the record. ↩
7. We also note that the minutes did not reflect the maximum amount to be received by the corporation as consideration for the shares. See section 1.1244(c)-1, Income Tax Regs.; H. Rept. No. 2198, supra, at p. 8, 1959-2 C.B. at p. 714↩. Of course, if the minutes had contained a sufficiently detailed plan, the presence or absence of a written proposal would not have been significant.
8. Neither petitioner nor respondent has distinguished between the shares owned by Fred and those owned by petitioner. Our holding herein makes it unnecessary to decide whether there should be a different treatment for tax purposes. ↩
9. Since the only years before us are 1958, 1959, and 1960 and since 1961 is involved only for the purpose of determining a net operating loss carryback, we are not called upon to determine whether petitioner is entitled to a capital loss in 1961. Moreover, we note that if petitioner actually suffered a loss there is a question whether it was sustained in 1961 or 1962 in view of the testimony of Tannenbaum that he received in escrow the payments of Pick 'N Save, Inc. in April 1961 and "had to hold that sum for one year before turning it over." He "turned it over to them [the Egers] ultimately."↩